**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARK LUTHER TROUP,        )
                                    )
              Plaintiff,      )      Civil Action No. 11-36 Erie
                                    )
     v.                       )
                                    )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,   )
                                    )
             Defendant.    )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

## I.  INTRODUCTION

Mark Luther Troup ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI" under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq.*  Plaintiff filed his applications on February 8, 2008, alleging disability since March 1, 2002 due to cervical surgery (AR 104-114; 69-82; 132).[1]  His applications were denied, and he requested an administrative hearing before an administrative law judge ("ALJ") (AR 46-54; 63-64).  Following a hearing held on November 30, 2009 (AR 23-42), the ALJ issued his decision denying benefits to Plaintiff on February 22, 2010 (AR 9-22).  Plaintiff's request for review by the Appeals Council was denied (AR 1-4), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision.  Presently pending before the Court are the parties' cross-motions for summary judgment.  For the reasons that follow, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.

---

[1] References to the administrative record [ECF No. 5], will be designated by the citation "(AR ___)".

II.    **BACKGROUND**

Plaintiff was 46 years old on the date of the ALJ's decision and completed school through the ninth grade (AR 129; 139).  He has past relevant work experience as an assembler, a lumber delivery driver, a landscape foreman, and a foundry mold pourer (AR 134).

*A.  Medical evidence*

Plaintiff was treated at the Elk Valley Medical Center for complaints of back, neck and wrist pain beginning in July 2002 (AR 189-248).  On September 5, 2002, John Flamini, M.D., performed an EMG and nerve conduction studies of the Plaintiff's upper extremities, which revealed minimal changes in the Plaintiff's right wrist, compatible with median neuropathy (AR 182-183).  Dr. Flamini recommended a right wrist splint and further cervical diagnostic studies (AR 183).  A cervical MRI showed a herniated disc at the C5-6 level with significant compression of the cervical canal (AR 228).  On October 9, 2002, Plaintiff was seen in the emergency room for low back pain after lifting pallets at work (AR 231).  He was seen by Wes Hilbert, M.D. for follow up on October 10, 2002, who diagnosed him with low back muscle strain and prescribed Motrin and Vicodin (AR 232).

On January 15, 2003, Plaintiff underwent an anterior cervical decompression and fusion with bone grafting without any significant complications (AR 14; 213; 215).  On April 24, 2003, Plaintiff had a lumbar MRI which revealed mild degenerative changes at the L2-3 level with no significant stenosis or disc protrusions noted (AR 283).  When seen by Dr. Hilbert on July 25, 2003, Plaintiff complained of back and neck pain, and reported that he continued to experience weakness and "clumsiness" in his arms and legs (AR 199).  He was diagnosed with residual neck pain and lower back pain, and was prescribed Vicodin and Elavil (AR 200).  Dr. Hilbert noted that Plaintiff had an appointment with Dr. Thomas for chronic pain management (AR 200).

When seen by Dr. Hilbert on September 8, 2003, Plaintiff continued to complain of back and neck pain, and reported that Dr. Thomas had suggested water therapy for his low back pain (AR 197).  On October 9, 2003, Plaintiff reported that his neck pain was "halfway better" and "livable" since his surgery (AR 195).  Dr. Hilbert noted that Plaintiff's pain was "stable" on

2

Vicodin, and he instructed Plaintiff to follow through with a cervical MRI and aquatic physical therapy (AR 196).

On July 20, 2005, Plaintiff began treatment at Community Health Net upon referral from the Department of Public Welfare ("DPW") due to a lack of insurance (AR 274). He complained of lower back pain (AR 274). Plaintiff was assessed with low back pain and was instructed to use over the counter medications until further evaluation (AR 274). Plaintiff continued to complain of low back pain when seen by a nurse on August 2, 2005 (AR 273). A lumbar x-ray of Plaintiff's spine dated August 9, 2005 showed relatively mild chronic changes at the L2-L3 and L4-5 levels (AR 255). When seen at Community Health Net on August 26, 2005, Plaintiff reported low back pain and left groin pain radiating down to his knee (AR 272). His x-rays were reviewed, and it was noted that his MRI in 2003 showed mild disc degeneration with no evidence of significant stenosis or disc protrusions or extrusions (AR 272). Plaintiff was assessed with low back pain, medications were prescribed, and an MRI was scheduled (AR 272). On September 5, 2005, a lumbar MRI of Plaintiff's spine showed degenerative changes isolated to the L2-3 disc level without nerve root impingement or other pathology (AR 281).

Plaintiff was referred for outpatient physical therapy in October 2005 by R. Anthony Snow, M.D., from Community Health Net (AR 251). Upon evaluation, Plaintiff reported intermittent low back pain and left thigh pain for the past one and one-half years (AR 251). He stated that his pain was exacerbated by repeated bending, prolonged sitting and walking distances (AR 251). He indicated that his symptoms were reduced when lying down (AR 251). Physical examination revealed decreased trunk range of motion, decreased tolerance for walking and sitting, and poor sitting posture and body mechanics (AR 253). The therapist recommended Plaintiff undergo three weeks of physical therapy, consisting of a home exercise program, a therapeutic exercise program, modalities for pain management, and posture and body mechanics education (AR 253).

Plaintiff returned to Community Health Net on November 10, 2005 and was seen by Merja Wright, M.D. (AR 270). Plaintiff reported a history of neck surgery, but indicated that his neck was "doing pretty well" with only occasional stiffness (AR 270). Plaintiff's main

3

complaint was chronic back pain due to a work injury in August 2002 (AR 270).  Plaintiff reported chronic discomfort with exacerbation radiating to the left groin area (AR 270).  On physical examination, Dr. Wright noted that Plaintiff showed "really poor conditioning," however, he was able to bend forward, backwards, and side to side, with some complaints (AR 270).  Plaintiff's straight-leg raising test produced pain in his back (AR 270).  Dr. Wright assessed Plaintiff with chronic lumbar pain and indicated he was a good candidate for pain management since his pain was "so specific" to his left groin (AR 270).

On November 22, 2005, Plaintiff continued to complain of lower back and leg pain radiating to his groin (AR 269).  The nurse noted that Plaintiff looked like he was "in obvious pain" (AR 269).  Physical examination revealed that he was unable to walk heel to toe without difficulty and was unable to bend down to touch his toes (AR 269).  Straight leg raise testing produced bilateral pain when raised greater than forty degrees (AR 269).  He was diagnosed with degenerative disc disease (AR 269).

Plaintiff complained of back pain when seen by Dr. Wright on December 22, 2005 (AR 268).  On physical examination, Dr. Wright found he could bend forward, backward, and from side to side, but experienced pain in his groin when bending backward (AR 268).  She diagnosed him with lumbar pain and a history of neck surgery, and scheduled him for possible injection therapy with Dr. Carnes (AR 268).

On January 5, 2006, Plaintiff returned to Dr. Wright and reported that his neck was "somewhat uncomfortable" and that he experienced numbness in his fingers upon bending his head towards the left (AR 268).  On physical examination, Dr. Wright found Plaintiff was in no acute distress, he was able to get on and off the examination table without any sign of discomfort, and his neck and lumbar range of motion was "better" than his last visit (AR 268).  He was diagnosed with, *inter alia*, neck and lumbar pain (AR 268).

Plaintiff returned to Dr. Wright on February 13, 2006 and reported that he had received an epidural injection to his lower back but was still having problems in his upper neck area (AR 265).  He claimed that he still had "a lot of problems," especially left-sided numbness and pain, and requested a referral to a neurosurgeon (AR 265).  On physical examination, Dr. Wright noted

4

Plaintiff was in no acute distress, he exhibited a "fairly reasonabl[e]" range of motion in his neck, somewhat limited left arm range of motion, and "surprisingly good" grip strength (AR 265). She diagnosed him with history of herniated disc in his neck, and status post surgery with continued symptoms (AR 265). She ordered an MRI and referred him to neurosurgery (AR 265).

A cervical MRI dated February 24, 2006 revealed an "unremarkable postoperative evaluation" of the cervical spine showing a fusion at the C5-6 level and no evidence of spondylosis or degeneration above or below the fusion site (AR 280).

On March 10, 2006, Plaintiff received a lumbar injection performed by Dr. Carnes (AR 345). When seen by Dr. Wright on March 17, 2006, Plaintiff reported some improvement following the epidural injection, but still complained of significant discomfort (AR 264). On physical examination, Dr. Wright noted Plaintiff was in no acute distress; his neck range of motion was not full due to his previous fusion surgery; his arm range of motion was good; his strength had improved; and there was no sensory loss (AR 264). Dr. Wright further found that Plaintiff's straight leg raising test was negative, observing that he could raise his leg up to almost ninety degrees without any discomfort in his lower back (AR 264). She noted that his cervical MRI revealed "just the old surgery and no new changes" (AR 264). Plaintiff was assessed with lumbar and cervical pain and he was to continue his treatment with Dr. Carnes and a neurologist (AR 264). On April 20, 2006, Plaintiff received a lumbar injection performed by Dr. Carnes (AR 332).

On May 12, 2006, Dr. Wright noted that Plaintiff's lumbar MRI in September showed some degenerative changes but "did not look bad" (AR 263). Plaintiff complained of pain radiating to his groin but indicated it had improved with injection therapy (AR 263). He was diagnosed with chronic lumbar pain with degenerative changes (AR 263). Plaintiff continued to complain of lumbar pain radiating to his testicles and left leg at his office visit on June 21, 2006 (AR 259).

On March 7, 2008, Plaintiff completed a disability function report describing how his impairments limited his activities (AR 155-164). Plaintiff reported that he was independent in

his personal care with some difficulty, was able to prepare meals and grocery shop, but was unable to perform household chores or yard work (AR 156-158).  Plaintiff indicated he was able to watch television but did so while lying down in order to relieve the pressure on his back (AR 159).  Plaintiff claimed the "only way" to relieve his pain was to lie down (AR 162).

Plaintiff underwent a consultative examination on April 29, 2008 performed by Silvia Ferritti, D.O., pursuant to the request of the Commissioner (AR 285-293).  Plaintiff relayed his past medical history and reported that he continued to have left low back pain with radiation to his legs (AR 285).  He claimed he had difficulty sitting for 15 to 20 minutes, standing for 15 to 20 minutes, and walking for 15 to 20 minutes (AR 285-286).  He reported that lying down on his side made him "feel better" and he took Aleve and Advil for pain relief (AR 286).

On physical examination, Dr. Ferretti found Plaintiff's cervical range of motion was mildly decreased on left rotation, his muscle strength was 5/5 bilaterally, his sensation was intact, and his lower extremity reflexes were 2/4 and symmetrical (AR 286).  Plaintiff was able to heel and toe walk, his straight leg raising test was negative in both the sitting and supine positions, and his hip, knee and ankle range of motion were within normal limits (AR 286-287).  Dr. Ferretti did find paravertebral muscle spasm in Plaintiff's thoracic and lumbar area (AR 287).  Dr. Ferretti formed an impression of chronic pain syndrome particularly in the low back with radiation in the left leg, status post cervical fusion at C5-C6, a history of depression, a history of coronary artery disease, and hypertension (AR 287).

Dr. Ferretti completed a medical source statement of Plaintiff's ability to perform work related physical activities (AR 288-289).  She opined that Plaintiff could frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds (AR 288).  She further opined that Plaintiff could stand and walk for five hours in an eight-hour workday and sit for up to eight hours, with periods of alternating between sitting, standing and walking (AR 288).  Dr. Ferretti found that Plaintiff was limited in his pushing and pulling abilities (AR 288).  Finally, she concluded that Plaintiff could occasionally make postural changes, but should never stoop, crouch or climb in a work setting (AR 289).

6

On May 15, 2008, Gregory Mortimer, M.D., a state agency reviewing physician, reviewed the medical evidence of record and found that Plaintiff could perform light work, but could only occasionally make postural changes, and should never climb ladders, ropes and scaffolds (AR 295-296).  In support of his findings, Dr. Mortimer summarized the prior diagnostic studies of the Plaintiff's cervical and lumbar spine from April 24, 2003 through February 24, 2006, Dr. Ferretti's April 29, 2008 consultative examination findings, and Dr. Ferretti's residual functional capacity assessment (AR 299-300).  Dr. Mortimer observed that his residual functional capacity assessment partially reflected Dr. Ferretti's assessment, since he found Dr. Ferretti's limitations in stooping, crouching and climbing were not consistent with the record (AR 300).  He further recognized Plaintiff's claimed limitations in standing, walking, carrying, bending, sitting, pushing, pulling, climbing, and other activities, but found that Plaintiff's statements were only partially credible in light of his medical history, the character of his symptoms, his daily activities, and the type of treatment he received (AR 300).

Plaintiff returned to Community Health Net on June 28, 2008 and reported that he was not working and was seeking disability secondary to back pain (AR 324-325).  Plaintiff exhibited a slow antalgic gait during the examination, but Bernadine Bagniszewski, C.R.N.P., reported that she watched Plaintiff walking outside with no antalgic gait and that he appeared "very comfortable" (AR 325).  He was assessed with low back pain and Ms. Bagniszewski declined to sign his DPW or disability forms without another appointment (AR 324).

Plaintiff was seen by Dr. Wright on August 18, 2008, who noted that she had not seen him for "a couple of years" (AR 323).  Plaintiff reported chronic lumbar discomfort radiating to his left leg (AR 323).  Dr. Wright indicated that the nurse practitioner had "not want[ed] to fill out MA forms" and therefore his medical assistance had run out (AR 323).  Dr. Wright completed his forms and assessed him with chronic lumbar pain (AR 323).  On September 15, 2008, Plaintiff was seen by Dr. Wright for a refill on his pain medications, and reported that his pain was "sometimes horrible and sometimes tolerable" (AR 322).  Plaintiff reported no bowel or bladder problems, and that injection therapy had been helpful (AR 322).  Dr. Wright assessed him with lumbar pain and noted that once she received an MRI report, Plaintiff would then be

referred for further treatment (AR 322).  Plaintiff's MRI dated September 15, 2008 showed stable degenerative changes at the L2-3 level compared to the MRI three years earlier (AR 333). The MRI also showed development of mild facet arthropathy[2] at the L4-5 level resulting in mild central canal stenosis (AR 333).

On October 2, 2008, Dr. Wright noted some weakness on the left side of Plaintiff's upper extremity secondary to his previous neck surgery (AR 321).  On November 13, 2008 Plaintiff complained of back pain that was "quite bothersome" (AR 320).  Dr. Wright reported that his straight leg raising test was "slightly uncomfortable" in the lower back and that he was "basically stiff" (AR 320).  She referred Plaintiff for a neurological consult (AR 320).  Plaintiff's cervical MRI dated November 19, 2008 showed post-operative and degenerative changes, and new degenerative end plate spondylosis at the C6-7 level in comparison to the February 24, 2006 exam (AR 342).  The operative level remained unremarkable, but the stenosis at the C6-7 level was created by uncovertebral joint osteophyte formation and a degenerated centrally bulging disc with moderate spinal cord and nerve root compromise (AR 342).

On November 24, 2008, Plaintiff reported continuing neck pain radiating into his shoulders (AR 319).  Dr. Wright noted that his MRI showed abnormalities below the surgical level (AR 319).  Plaintiff also complained of continuing lumbar pain (AR 319).  On physical examination, Dr. Wright found his neck range of motion was "painful," his strength was weaker than what she expected from a "man his size," and that he was "stiff everywhere" (AR 319).  She found no sensory loss (AR 319).  Plaintiff was diagnosed with neck and lumbar pain with "a lot of degenerative changes with radicular symptoms" (AR 319).  She discussed the importance of weight loss and referred him for a neurological consultation (AR 319).

Plaintiff returned to Dr. Wright for follow up on January 5, 2009 (AR 318).  He reported continuing problems with his neck and back, complaining of left-sided weakness with some radiculopathy down his right arm and leg (AR 318).  He reported no other neurological changes or gait changes, and he requested a refill of his Lortab until seen by neurosurgery (AR 318).  He

---

[2] Lumbar facet arthropathy is joint disease of the facet joint in the lower back region.  *See* http://facetarthropathy.net.

was diagnosed with, *inter alia*, history of neck surgery, arm weakness and lumbar pain (AR 318).

On January 27, 2009, Plaintiff was evaluated by Melissa Jorden, D.O., at the Center for Pain Management at Saint Vincent (AR 334-336). Plaintiff complained of low back pain and left lower extremity pain (AR 334). He stated that his pain increased with standing, sitting and walking, but was decreased by lying down (AR 334). He took Vicodin twice daily and rated his current pain level as 10/10 (AR 334). On physical examination, Dr. Jorden found Plaintiff exhibited 5/5 muscle strength; had a full range of motion on lumbar flexion and a decreased range of motion on extension; a negative straight leg raise test bilaterally; and some pain with palpation over the lumbar paraspinal musculature bilaterally (AR 335). Dr. Jorden formed an impression of low back pain, degenerative disc disease, MRI evidence of L4-5 spinal stenosis, possible left sacroilitis and possible left facet arethropathy per physical examination (AR 335). She was of the view that his pain was most likely secondary to his spinal stenosis, and recommended an epidural steroid injection (AR 335).

Plaintiff returned to Dr. Wright on February 5, 2009 for a refill of his pain medication (AR 315). Different pain management options were discussed, and Dr. Wright recommended that he lose weight and strengthen his musculature (AR 315). Plaintiff reported pain and weakness on the left and burning discomfort in the lumbar area (AR 315). Dr. Wright observed on physical examination that Plaintiff had difficulty with getting on and off the examination table (AR 315). He was diagnosed with chronic lumbar pain with left-sided radicular symptoms and his pain medications were refilled (AR 315). On February 18, 2009, Plaintiff was seen by Ms. Bagniszewski and requested a refill of his pain medications claiming he had lost them (AR 317). Ms. Bagniszewski refused however, since thirty days had not elapsed since his last refill and she was unable to verify Plaintiff's claim (AR 317). Plaintiff reported no changes since his last visit with Dr. Wright, and he was assessed with back pain (AR 317). On February 16, 2009, Dr. Jorden administered a lumbar epidural injection at the L4-5 level (AR 347).

When seen by Dr. Wright on March 12, 2009, Plaintiff reported that his last injection had not helped his pain (AR 314). Dr. Wright noted that she thought Plaintiff was "permanently

9

disabled" (AR 314).  Plaintiff complained of back pain but that he was walking to stay flexible (AR 314).  Dr. Wright found Plaintiff in no acute distress and diagnosed him with chronic lumbar pain (AR 314).  On April 10, 2009 Plaintiff was seen by Jill Fuller, C.R.N.P. for a refill of his pain medications and a random drug screen was conducted (AR 316).

On May 12, 2009, Plaintiff reported that he was "having a hard time with his back" and was trying to stretch out his pain medication (AR 313).  He further reported trying to lose weight because he recognized that his abdominal size affected his lower back pain (AR 313).  He claimed he was walking daily but it exacerbated his back pain (AR 313).  On physical examination, Dr. Wright noted lower back tenderness on palpation (AR 313).  He was diagnosed with chronic lumbar pain, that was ameliorated through pain medications (AR 313).  On June 11, 2009, Dr. Wright instructed Plaintiff on core exercises and refilled his pain medications (AR 312).  On July 10, 2009 Plaintiff's pain medications were refilled (AR 311).  Plaintiff was in no acute distress when seen by Dr. Wright on August 10, 2009 (AR 310).  His medications were refilled and a random drug screen was conducted (AR 310).

Plaintiff returned to Dr. Wright on September 10, 2009 for a refill of his pain medications (AR 309).  Dr. Wright reported that Plaintiff tested positive for cannabis on the drug screen and she refused his request for narcotics (AR 309).  Dr. Wright noted that she would consider restarting hydrocodone if Plaintiff had a clean drug screen (AR 309).  On physical examination, Dr. Wright noted Plaintiff was in no acute distress and Plaintiff reported feeling "pretty good" at the examination (AR 309).  Plaintiff reported his pain level at a 5, but Dr. Wright noted that he was "not expressing it with his facial expressions" (AR 309).  She diagnosed him with chronic lumbar pain and prescribed Voltaren Gel for pain relief (AR 309).  Plaintiff submitted to another urine drug screen (AR 309).

On September 28, 2009, Dr. Wright reminded Plaintiff of the clinic's drug policy, but decided to refill his narcotic prescription because she viewed Plaintiff's use of marijuana on one occasion as "his only slip" and because it was "the only thing that help[ed] his chronic back pain" (AR 308).

Finally, on December 7, 2009, Dr. Wright completed a form entitled "Medical Statement Regarding Pain" (AR 344). Dr. Wright indicated that Plaintiff suffered from chronic pain that resulted in the need to lie down at unpredictable times for two or more hours per day (AR 344). Dr. Wright further indicated that Plaintiff's need to lie down was reasonably necessary based upon her observation of Plaintiff, review of test results, and review of signs/symptoms (AR 344).

   *B.  Hearing testimony*

Plaintiff and George Starosta, a vocational expert, testified at the hearing held by the ALJ on November 30, 2009 (AR 23-42). Plaintiff testified that he suffered from constant back, left leg and left groin pain (AR 30). He stated that he could only stand or walk for twenty minutes and sit for twenty minutes (AR 30). He could lift twenty pounds and bend at the waist but needed help getting back up (AR 37). Plaintiff indicated that epidural injections were not effective in controlling his pain and his medications caused drowsiness (AR 30; 32). He claimed that he needed to lie down for two to three hours per day in order to alleviate his back pain (AR 31). Plaintiff testified that he had reduced turning mobility in his neck, and claimed it would cramp and ache after fifteen minutes in one position (AR 36).

Plaintiff testified that he lived with his disabled girlfriend who performed all the household chores and grocery shopping (AR 31-33). Although he had a driver's license, Plaintiff testified that he did not drive much because he had difficulty getting in and out of the truck and it made him uncomfortable (AR 32). He explained that he tested positive for marijuana on one occasion because he unknowingly ate brownies which contained it (AR 33-34).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to light work, except he would be able to stand and walk up to five hours in a workday and sit up to eight hours in a workday, and should be afforded the option to sit or stand, changing position at a maximum frequency of every thirty minutes (AR 39-40). The individual would further be precluded from: pushing or pulling with the upper and lower extremities, and crouching, balancing, climbing or stooping (AR 40). The individual was limited to occasional bending and kneeling, and should avoid exposure to moderate environmental hazards (AR 40). The vocational expert testified that such an individual

11

could work as a cashier, ticket taker, and greeter (AR 40).  The vocational expert further testified that no jobs would be available to such individual if he needed to lie down throughout the day beyond the customary breaks and lunch hour (AR 41).

Following the hearing, the ALJ issued his decision denying benefits to the Plaintiff (AR 9-22) and his request for review by the Appeals Council was denied (AR 1-4), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  He subsequently filed this action.

### III.    STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3rd Cir. 1995).  It has been defined as less than a preponderance of evidence but more than a mere scintilla.  *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3rd Cir. 1995).  Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.  A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3rd Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings.").  To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole.  *See* 5 U.S.C. § 706.

## IV.    DISCUSSION[3]

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A).  Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a).  A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI.  *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a).  In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c).  The ALJ found that Plaintiff met the disability insured status requirements of the Act through December 31, 2009 (AR 11).  SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner uses a five-step evaluation process to determine when an individual meets this definition.  *See* 20 C.F.R. §§ 404.1520; 416.920.  The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).  If the claimant is determined to be unable to

---

[3] Plaintiff challenges the ALJ's decision with respect to his cervical and lumbar impairments only; therefore, we limit our discussion accordingly.

resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Here, the ALJ concluded that Plaintiff had the following severe impairments: bilateral carpal tunnel syndrome (CTS), back disorder, chronic obstructive pulmonary disease (COPD), hypertension, hyperlipidemia and obesity, but determined at step three that he did not meet a listing (AR 12-13). The ALJ described the Plaintiff's residual functional capacity as follows:

> … I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[4] except he would be able to stand and walk up to 5 hours in a workday, and sit up to 8 hours in a workday. He should be accorded the option to sit or stand with changing position at a maximum frequency of every 30 minutes. He should not do pushing or pulling with the upper and lower extremities. He should not do any crouching, balancing, climbing or stooping. He would be limited to occasional bending and kneeling. He should avoid exposure to moderate dust, fumes, gases, hot and cold temperature extremes, humidity and dampness.

(AR 13) (footnote added). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 20-21). The ALJ also determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible to the extent they were inconsistent with his residual functional capacity assessment (AR 14). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

---

[4] This definition states:

> … Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

Plaintiff challenges the ALJ's rejection of Dr. Wright's opinion that he would need to lie down at "unpredictable times" for two or more hours per day in order to alleviate his pain. [ECF No. 8] at pp. 8-17. The Third Circuit has repeatedly held that "[a] cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3rd Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3rd Cir. 1994). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3rd Cir. 1993). A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Halter*, 247 F.3d 34, 43 (3rd Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).

In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence."). Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for

rejecting or discrediting competent evidence."); *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981) (without an adequate explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.").

Plaintiff contends, in essence, that in rejecting Dr. Wright's opinion as to his need to lie down throughout the day, the ALJ failed to meaningfully address, in contravention of the above cited case law, the basis for his rejection of the treating physician's opinion. In assigning "little weight" to Dr. Wright's opinion, the ALJ stated:

> In this case, Dr. Wright is a treating physician and his (sic) opinion would ordinarily be entitled to great weight. However, Dr. Wright's opinion is not supported by her treating notes which do not contain significant objective findings. Additionally, the opinion of Dr. Wright is contradicted by the objective findings of the consultative examiner. Finally, Dr. Wright merely completed a form without proving any explanation. It is well established that opinions rendered on check-box or form reports that do not contain any explanation or supporting rationale for the conclusions reached may be accorded little or no weight. See <u>Mason v. Shalala</u>, 994 F.2d 1058, 1065 (3d Cir. 1993). Thus, the opinion of Dr. Wright is given little weight because it is not supported by the evidence and it is not consistent with the record as a whole (See SSR 96-6p).

> Following the hearing, I held the record open for the claimant to provide updated treatment records from Dr. Wright. However, claimant did not submit any treatment records from Dr. Wright for treatment after September 2009. The claimant failed to request additional time or provide an explanation as to why she (sic) did not submit updated records from Dr. Wright. After the hearing claimant did submit other treatment records and a medical source statement from Dr. Wright and I have considered those records. However, the lack of post September 2009 treatment records from Dr. Wright lessens the weight that I give to her opinion. I find this to be important particularly because Dr. Wright's last note that is in the record notes questionable behavior on behalf of the claimant in that he tested positive for marijuana in violation of the drug policy and that she was going to overlook it this one time and reinstate his prescriptions for narcotics. 8F page 2.

AR 17-18. The ALJ summarized his review of Dr. Wright's treatment notes as follows:

> Merja Wright, M.D., treated the claimant conservatively with medications for his impairments from November of 2005 to June of 2006 and August 2008 through September of 2009. During this time, Dr. Wright diagnosed the claimant with lumbar pain, COPD, hypertension, hyperlipidemia and obesity. Examinations of

16

the claimant routinely revealed minimal findings with the claimant being in no acute distress (Exhibits 4F, 8F).  In February 2009, the claimant was noted to have lost his narcotic medication.  The claimant sought additional narcotic medication.  At the claimant's last visit on September 28, 2009, the claimant complained of back pain.  Dr. Wright noted the claimant tested positive for marijuana.  Dr. Wright diagnosed the claimant with cough and probably COPD and chronic lumbar pain.  Dr. Wright prescribed the claimant medications (Exhibit 8F).  There is no record of the claimant returning to Dr. Wright after September of 2009.

(AR 15).  Absent from the ALJ's discussion, however, are treatment note entries that arguably lend support to Dr. Wright's opinion.  Plaintiff complained of low back pain at his initial visit to Community Health Net on July 20, 2005 (AR 274).  He continued to complain of low back pain at two office visits in August 2005 (AR 272-273).  On November 10, 2005, Plaintiff again complained of low back pain, and Dr. Wright reported that Plaintiff's straight leg raise testing produced pain in his back (AR 270).  When seen by the nurse practitioner on November 22, 2005, it was reported that Plaintiff was "in obvious pain," he was unable to walk heel to toe without difficulty, he was unable to bend down and touch his toes, and his straight leg raise testing produced bilateral pain when raised greater than forty degrees (AR 269).  On December 22, 2005, Dr. Wright found that Plaintiff experienced pain in his groin when bending backward (AR 268).

Plaintiff complained of neck pain in January and February 2006, and Dr. Wright found Plaintiff had a limited left arm range of motion (AR265).  In March 2006, Plaintiff complained of significant discomfort in his left lumbar area, and Dr. Wright noted that Plaintiff had a decreased neck range of motion (AR 264).  Plaintiff continued to complain of lumbar pain at his office visits in May and June 2006 (AR 259; 263).  When seen by Dr. Wright on August 18, 2008, Plaintiff complained of chronic low back pain radiating to his left leg and was assessed with chronic lumbar pain (AR 323).  Plaintiff reported that his pain was "sometimes horrible" in September 2008 and Dr. Wright assessed him with lumbar pain (AR 322).   In November 2008, Plaintiff exhibited "painful" neck range of motion and decreased strength (AR 319).

Plaintiff continued to report neck and back pain throughout 2009.  In February 2009, Dr. Wright noted that Plaintiff had difficulty with getting on and off the examination table (AR 315). Dr. Wright thought Plaintiff was "permanently disabled" due to his back pain in March 2009 (AR 314).  On May 12, 2009, Dr. Wright found lower back tenderness on palpation (AR 313). As of September 28, 2009, Dr. Wright was of the opinion that narcotic medication was the only "thing that help[ed]" Plaintiff's chronic back pain (AR 308).

In addition, Plaintiff's lumbar diagnostic studies revealed mild stenosis at the L4-5 level and degenerative disc disease at the L2-3 level (AR 281; 333).  His cervical studies showed post-operative degenerative changes and stenosis at the C6-7 level created by uncovertebral joint osteophyte formation and a degenerated centrally bulging disc with moderate spinal cord and nerve root compromise (AR 342).  In sum, the Community Health Net notes consistently referenced Plaintiff's complaints of back and/or neck pain, as well as diagnostic studies which arguably lend support to Dr. Wright's opinion.  On remand, the ALJ is directed to address this evidence consistent with *Cotter*.

The ALJ also assigned Dr. Wright's opinion little weight because, in his view, she merely provided a "form without proving (sic) any explanation" (AR 17).  In *Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993), the Third Circuit found that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."  The court concluded that, in the absence of identifiable evidentiary corroboration of the physician's conclusions, the form report did not constitute substantial evidence sufficient to support a finding of the claimant's capacity to perform sedentary work.  *Id*.  Here however, Dr. Wright's opinion does not stand alone; Dr. Wright stated that the Plaintiff's need to lie down was reasonably necessary based upon her "observation of the [Plaintiff], review of test results, and review of signs/symptoms" (AR 344).  Consequently, on remand, the ALJ should reconsider the import of the form styled "Medical Statement Regarding Pain" in light of the previously described medical records.

Finally, Plaintiff argues that the ALJ improperly discredited his subjective complaints. As the finder of fact, the ALJ can reject, partially or fully, subjective complaints if he finds them

18

not credible based on other evidence in the record.  *See Baerga v. Richardson*, 500 F.2d 309, 312 (3rd Cir. 1974).  The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court.  *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3rd Cir. 1983).  The ALJ concluded that Plaintiff's subjective complaints concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible to the extent they were inconsistent with his residual functional capacity assessment  (AR 14).  In light of the Court's finding that the ALJ's review of the medical record was inadequate, appropriate consideration could not have been given to the Plaintiff's subjective complaints and the ALJ is directed to reevaluate the Plaintiff's credibility following his consideration of all the evidence.

## V.     CONCLUSION

For the reasons discussed above, the Plaintiff's motion for summary judgment will be denied and the Defendant's motion for summary judgment will be denied.  The matter will be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion.[5]  An appropriate Order follows.

---

[5] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion.  *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3rd Cir. 2010).

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARK LUTHER TROUP,            )
                             )
            Plaintiff,        )        Civil Action No. 11-36 Erie
                             )
      v.                      )
                             )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security, )
                             )
            Defendant.        )

## ORDER

AND NOW, this 18th day of April, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [ECF No. 7] is DENIED and Defendant's Motion for Summary Judgment [ECF. No. 9] is DENIED.  This case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

                          s/ Sean J. McLaughlin
                            United States District Judge

cm:    All parties of record